UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: April 3, 2017
```

-------------------------------------------------------X
                                   :

IRMASTENE FRANCINE CLARKE,      :
                    Plaintiff,   :

                                  :          15-cv-354

       -v-                :

                                  :        CORRECTED
CAROLYN W. COLVIN, Acting     :  OPINION & ORDER[1]
Commissioner of Social Security,  :
                  Defendant. :
                                  :
-------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

      Plaintiff Irmastene Francine Clarke seeks review, pursuant to 42 U.S.C.

§ 405(g), of the decision by defendant Commissioner of Social Security

("Commissioner"), finding that she was not disabled and not entitled to

Supplemental Security Income benefits under Title XVI of the Social Security Act.

The parties have filed cross-motions for judgment on the pleadings.  Plaintiff argues

that the Commissioner made several errors in her decision and requests that the

decision be reversed and plaintiff's claim be remanded for an award and calculation

of benefits, or, in the alternative, for further proceedings.  The Commissioner

---

[1] On January 31, 2017, the Court granted plaintiff's motion for judgment on the pleadings and
remanded this case solely for calculation and disbursement of benefits.  (ECF No. 25.)  Subsequently,
defendant filed a motion to alter or amend the judgment. (ECF No. 27.)  As the Court notes in its
Order being issued simultaneously with this decision, defendant's motion is GRANTED.  This
Corrected Opinion & Order supersedes the Court's January 31 decision—the Court now grants
plaintiff's motion for judgment on the pleadings but remands the case for further proceedings
consistent with this Corrected Opinion & Order.

opposes, arguing that the decision was legally correct and supported by substantial evidence.  For the reasons set forth below, the Court GRANTS plaintiff Clarke's motion for judgment on the pleadings and DENIES the Commissioner's cross-motion for judgment on the pleadings.  As described below, this case is therefore remanded to the Administrative Law Judge for further proceedings consistent with this Opinion.

I.   PROCEDURAL AND FACTUAL BACKGROUND

A.   <u>Procedural Background</u>

Plaintiff Irmastene Francine Clarke filed an application for Supplemental Security Income ("SSI") benefits on March 28, 2012.  (Tr. 143-151.)  The Social Security Administration ("SSA") denied the application.  (Tr. 68-69, 72-83.) Plaintiff then requested an administrative hearing, Tr. 85-86, which took place before an administrative law judge ("ALJ") on June 3, 2013, Tr. 44-67.  The ALJ, before whom plaintiff and her attorney appeared, issued a decision finding that plaintiff was not disabled and not eligible for monthly SSI benefits.  (Tr. 24-38.) The ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner") when the Appeals Council denied plaintiff's request for review on January 28, 2015.  (Tr. 1-6.)

B.   Factual Background[2]

1.   Non-medical evidence

Plaintiff was born in August 1967.  (Tr. 143.)  She attended school through the tenth grade (in special education) and had past work experience primarily as a home aid.  (Tr. 48, 54, 178-79, 192.)  Plaintiff testified that she was disabled due to manic-depressive disorder, schizophrenia, diabetes, asthma, and high blood pressure.  Plaintiff reported multiple instances of past sexual and physical abuse.  (Tr. 238, 331, 350, 506.)  Plaintiff also reported past substance abuse issues.  (Tr. 53.)

2.   Medical evidence

a)   Treating physicians

Dr. Elva Naco is plaintiff's treating psychiatrist at the Center for Urban Community Services (also referred to as the Jericho Project).  (Tr. 234-40, 521-25, 539-608.)  Dr. Naco saw plaintiff on November 20, 2010, February 19, 2011, and March 19, 2011, and on an approximately monthly basis from May 2012 through March 2013.  (Id.)

Using the multi-axial system of assessment,[3] Dr. Naco diagnosed plaintiff with bipolar disorder, acute stress disorder, and cocaine and alcohol abuse on Axis I;

---

[2] The following facts are drawn from the administrative record.

[3] Under the multi-axial system of assessment, each Axis refers to a different domain of information that may help the clinician to plan treatment and predict outcome.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM") 27 (4th ed. 2000).  Axis I refers to clinical disorders and other conditions that may be a focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions; Axis IV refers to psycho-social and environmental problems; and Axis V refers to global assessment of functioning ("GAF").  Id.  GAF refers to the individual's overall level of functioning and is assessed by using the GAF scale which provides ratings in ten ranges with higher scores reflecting greater functioning.  Id. at 32, 34.  A

deferred diagnosis on Axis II; diabetes on Axis III; moderate stressors on Axis IV; and a global assessment of functioning score ("GAF") of 58 on Axis V. (Tr. 240, 558, 563, 569, 576-77, 580, 584, 587-88, 594, 599.) Dr. Naco noted that plaintiff had a history of being abused and poor compliance with her medication. (Tr. 540-41.) Dr. Naco prescribed plaintiff Abilify and Seroquel for mood lability. (Tr. 542, 544, 549.)

On May 5, 2012, plaintiff reported to Dr. Naco that plaintiff had been clean and sober for six weeks, but that she continued to experience mood swings, poor focus, and periods of irritability. (Tr. 237.) Dr. Naco noted that plaintiff appeared well-groomed and wore casual and clean clothes. (Tr. 238.) Dr. Naco reported that plaintiff experienced ongoing symptoms of insomnia, flashbacks from past rapes, decreased focus, anger, and mood swings. (Id.)

On May 5, 2012, Dr. Naco also detailed her medical opinion on the severity of plaintiff's bipolar disorder in a Psychiatric/Psychological Impairment Questionnaire. Dr. Naco noted clinical evidence of poor memory, sleep and mood disturbances, substance dependence, intrusive recollections of traumatic experience, difficulty concentrating, and hostility/irritability. (Tr. 275.) Dr. Naco assessed that plaintiff had no limitations of her abilities to understand, remember and carry out one or two step instructions; ask simple questions, or request assistance; be aware of normal hazards; take appropriate precautions; and travel to unfamiliar places or take public transportation. (Tr. 277-79.) She assessed that plaintiff had mild limitations of her abilities to make simple work-related decisions. (Tr. 278.)

---

GAF of 41 to 50 indicates serious symptoms or serious difficulty in social, occupational, or school functioning. Id.

4

Dr. Naco further opined that plaintiff was markedly limited – defined as being effectively precluded from performing the activities in a meaningful manner – in her ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerance; work with or near others without being distracted; set realistic goals or make plans independently; and complete a workweek without interruption from psychologically based symptoms.  (Tr. 276-279.)  Dr. Naco assessed that plaintiff was moderately limited – defined as significantly limited but not totally precluded – in her ability to remember locations and work-like procedures; understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; sustain ordinary routine without supervision; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting.  (Tr. 276-78.)

On May 5, 2012, Dr. Naco also completed a separate questionnaire for the Social Security Administration ("SSA") opining that plaintiff was unable to work. Dr. Naco further opined that plaintiff had limited understanding and memory due to poor focus and limited sustained concentration and persistence, social interaction, and adaptation due to mood swings, racing thoughts and irritability. (Tr. 514-19, duplicated at Tr. 609-12, 615.)  In this report, Dr. Naco included mental

status findings, indicating that plaintiff's thought process was goal-directed, but that plaintiff's mood was irritable and angry at times; she had occasional mood swings and her affect was reactive.  (Tr. 616.)  Plaintiff's ability to perform calculations was fair due to diminished focus.  (Id.)  Plaintiff's insight and judgment were impaired at times.  (Id.)  Plaintiff was maintained on Seroquel and supportive therapy.  (Tr. 617.)  Her illness was chronic, but "better at this time."  (Id.)

On May 19, 2012, Dr. Naco responded to the SSA's request for specific examples to support her conclusion that plaintiff was limited with respect to her abilities in understanding and memory, sustained concentration, social skills, and adaptation.  (Tr. 497, duplicated at Tr. 603.)  Dr. Naco responded that her report was based upon her own observations that plaintiff was "quite hyper" and needed redirection and was "easily irritable, nervous, and impatient" during severe mood swings, causing problems with focus and memory.  (Id.)  She also stated that plaintiff could be quite sensitive to minor criticisms "and has had issues with staff members."  (Id.)  On June 9, 2012, Dr. Naco continued to report that plaintiff was unable to work.  (Tr. 600.)

On October 20, 2012, Dr. Naco completed a FEGS WeCare Medical report.  (Tr. 234.)  Plaintiff's diagnoses were bipolar disorder, PTSD, and cocaine abuse in partial remission.  (Id.)  Plaintiff had mood swings, irritability, flashbacks of past rapes, low energy level, and a diminished memory.  (Id.)  Plaintiff was on Seroquel and Ambien.  (Tr. 234.)  Her illnesses were chronic with a relapsing and remitting

course.  (Id.)  Dr. Naco reported that plaintiff was unable to work for at least 12 months.

On March 2, 2013, Dr. Naco completed a second Psychiatric/Psychological Impairment Questionnaire that recorded findings generally unchanged from the first questionnaire completed on May 5, 2012.  (Tr. 618-625.)  Dr. Naco reported that plaintiff's use of drugs and/or alcohol was a symptom of her condition or form of self-medication, and that plaintiff's disability was independent of any substance use.  (Tr. 626.)

From October 2012 through April 2013, plaintiff also saw Eloisa Negron Rodriguez, a licensed social worker, in the medical office of Dr. Indrani Persaud, plaintiff's primary care physician.  (Tr. 638-39, 642-43, 647-56, 663, 686, 695, 715-18, 721.)  Ms. Rodriquez saw plaintiff approximately monthly, providing therapeutic counseling for complaints of depression.

In addition, plaintiff was seen by Dr. Persaud for medical care.  Dr. Persaud saw plaintiff anywhere from once a month to once in six months.  (Tr. 242.)  On July 18, 2012, Dr. Persaud completed a "Multiple Impairment Questionnaire" diagnosing plaintiff with uncontrolled diabetes, asthma, bipolar disorder, schizophrenia, and bilateral leg pain.  (Id.)  Dr. Persaud noted that plaintiff had symptoms of daily bilateral leg pain.  (Tr. 243.)  According to Dr. Persaud, plaintiff's pain was severe, rating it a 9 on a scale of 1 to 10.  (Tr. 244.)  Dr. Persaud did not list fatigue as a symptom, but when asked to rate it, she stated that it was moderately severe – an 8

on a scale of 1 to 10.  (Tr. 244.)  Dr. Persaud noted that medication did not fully
relieve plaintiff's pain.  (Id.)

Dr. Persaud opined that in an eight-hour workday, plaintiff could sit for one
hour and stand/walk one hour.  (Id.)  She would have to get up from the sitting
position every thirty minutes or so, and could sit back down after another 30
minutes.  (Id.)  She could lift up to ten pounds.  (Tr. 245.)  Dr. Persaud assessed that
due to pain and stiffness in plaintiff's fingers and hands, plaintiff had moderate
limitations of grasping, turning, and twisting objects, fine manipulation and
reaching, including overhead.  (Tr. 246.)

Dr. Persaud stated that plaintiff's condition would interfere with her ability
to keep her neck in a constant position and that her symptoms would interfere with
her attention and concentration.  (Tr. 246-47.)  Stress impacted plaintiff's
symptoms, and according to Dr. Persaud, she was therefore unable to tolerate even
low stress work.  (Tr. 247.)  Dr. Persaud indicated that plaintiff would regularly
need to take unscheduled breaks of one hour, Tr. 247, and miss work more than
three times a month, Tr. 248.  In addition, from a check off list, Dr. Persaud
indicated that plaintiff had psychological limitations; had to avoid noise, fumes,
gases, temperature extremes, humidity, dust, and heights; had limited vision; and
was unable to pull, kneel, bend or stoop.  (Tr. 248.)

On October 23, 2012, Dr. Persaud completed a medical report for the FEGS
WeCare program.  (Tr. 232-33.)  She diagnosed plaintiff with diabetes, asthma and
bipolar disorder.  (Tr. 232.)  She noted that plaintiff was alert and oriented times

8

three (she had orientation of time, place, and person). (Tr. 232.) Plaintiff had a normal physical examination with the exception of bilateral expiratory wheezing. (Tr. 232.) Despite medication, her diabetes was uncontrolled. (Tr. 232.) Plaintiff's asthma was mild and persistent. (Tr. 233.) Her bipolar disorder was in "remitting course." (Tr. 233.) Dr. Persaud indicated that plaintiff had no functional limitations, but that she was unable to work for at least twelve months due to depression and mood swings. (Tr. 233.)

b)    Consulting medical sources

On May 14, 2012, Howard Tedoff, Ph.D. conducted a consultative psychiatric assessment of plaintiff at the request of SSA. (Tr. 505-08.) Plaintiff reported sobriety for the past year. (Tr. 506.) She complained of hearing voices and seeing faces. (Id.) Plaintiff stated that she could only read at a third grade level and had only limited multiplication skills. (Id.)

Plaintiff was cooperative during a mental status examination. (Id.) Her manner of relating, social skills, and overall presentation were adequate. (Id.) Plaintiff was dressed and groomed casually, her posture and gait were normal, and she made appropriate eye contact. (Id.) Plaintiff spoke intelligibly and in a relevant and goal-directed manner and conversed interactively. (Id.) Plaintiff's thought processes appeared coherent and "to some extent" goal-directed. (Tr. 507.) Dr. Tedoff noted that plaintiff had a history of auditory and visual hallucinations that were in remission on medication. (Id.) Plaintiff denied suicidal ideation. (Id.) When not on medication, plaintiff engaged in self-hurting behavior. (Id.)

9

Plaintiff was tearful about her history; her affect was congruent with her speech and thought content.  (Id.)  Plaintiff's mood was euthymic on medication, but without medication, psychotic features prevailed.  (Id.)  On medication, plaintiff was oriented times three.  (Id.)  Plaintiff's attention and concentration were mildly impaired; she had difficulty with calculations and counted up instead of down in doing serial threes.  (Id.)  Upon recent and remote memory skills testing, plaintiff could recall six digits forward, three digits in reverse order and recall three out of three items after five minutes.  (Id.)  Plaintiff's insight was good and her judgment was fair on medication.  (Id.)  Plaintiff's cognition appeared to be near average with a weak fund of information.  (Id.)

Dr. Tedoff opined that plaintiff was able to follow and understand simple directions and instructions and perform simple tasks independently, and that she had adequate attention and memory to perform the demands of simple tasks.  (Id.)  Dr. Tedoff noted that plaintiff felt unable to maintain a regular schedule even on medication.  (Id.)  Her decision making skills were improving, but had been questionable in the past.  (Id.)  Plaintiff related adequately with others and had dealt with work place stress in the past, but now her health could cause difficulty dealing with stress. (Tr. 508.)  Dr. Tedoff concluded that the results of the examination were consistent with psychiatric and physical problems that "may interfere" with plaintiff's ability to function in the workplace on a daily basis.  (Id.)  Dr. Tedoff considered plaintiff to have a poor prognosis for sustaining gainful employment.  (Id.)

On May 14, 2012, Dr. Sharon Revan conducted a consultative internal medicine examination of plaintiff at the request of SSA.  (Tr. 509-11.)  Dr. Revan assessed diabetes, asthma, bipolar disease, and depression.  (Tr. 511-12.)  Dr. Revan noted that plaintiff had numbness and spasm in her hands and feet.  (Tr. 509.)  Plaintiff reported blurred vision and elevated liver function test results.  (Id.)  Plaintiff acknowledged that she smoked daily; she acknowledged past drug use only through 2011.  (Tr. 510.)  In Dr. Revan's opinion, plaintiff had no limitations of the upper extremities for fine or gross motor activity and no limitations of sitting or standing.  (Tr. 512.)  Dr. Revan opined that plaintiff had a mild limitation of walking and climbing stairs due to shortness of breath.  (Id.)

Finally, on June 8, 2012, Dr. V. Reddy reviewed plaintiff's file as a non-examining consulting physician for the SSA.  Dr. Reddy reviewed the record and concluded that plaintiff could follow and understand simple directions and instructions and perform simple tasks independently; that she had adequate skills to perform simple tasks; and that she could relate adequately to others.  (Tr. 494.)  Dr. Reddy noted that plaintiff had bipolar disorder and a long history of alcohol, cocaine, and heroin use.  (Id.)  Dr. Reddy noted the mental status findings reported by Dr. Tedoff, and that Dr. Naco reported that plaintiff's condition was better "at this time."  (Id.)  Dr. Reddy noted Dr. Naco's assessment precluding plaintiff from even entry level work, but found it to be inconsistent with the doctor's treatment notes reflecting that plaintiff was cooperative, maintained good eye contact, had normal psychomotor activity, and normal concentration.  (Id.)  Dr. Reddy opined

that plaintiff's attention and concentration skills were adequate for the demands of the performance of simple tasks.  (Id.)

### 3.   Plaintiff's testimony before the ALJ

At the administrative hearing held on June 3, 2013, plaintiff testified that she last worked in 2010, when she was terminated after passing out from uncontrolled blood sugar levels.  (Tr. 48.)  Plaintiff described numbness in her hands and sharp pains in her feet, which she attributed to uncontrolled diabetes. (Tr. 49, 56.)  Plaintiff estimated that she can only stand for 45 minutes and walk for two blocks, after which she is tired and must "take a breather."  (Tr. 51-52, 54.) Plaintiff testified that she no longer cuts herself, hears voices, or contemplates suicide, but that she still has nightmares and hallucinates, seeing faces as often as four days a week.  (Tr. 59.)  Plaintiff further testified that she had mood swings, problems with forgetfulness, difficulty being around other people she does not know, and difficulty concentrating most of the time.  (Tr. 51, 61.)  Plaintiff explained that she forgets simple things such as her own phone number.  (Tr. 61.)  She also testified that she had problems completing paperwork and cannot fill out forms by herself.  (Tr. 62.)  In addition, plaintiff reported that she falls asleep at inappropriate times during the day.  (Tr. 57.)

## II.   APPLICABLE LEGAL PRINCIPLES

### A.   Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R.

Civ. P. 12(c) motions for judgment on the pleadings." Bank of N.Y. v. First Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010) (citation omitted).  Therefore, "[t]o survive a Rule 12(c) motion, the complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Id. (quoting Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010)).

B.   The Disability Standard

The Commissioner will find a claimant disabled under the Act if he or she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).  The disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).

The Commissioner uses a five-step process when making disability determinations.  See 20 C.F.R. §§ 404.1520, 416.920.  The Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in [Appendix 1].  If the

13

> claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work.  Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citation and footnote omitted); see also Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998).  The claimant bears the burden of proof in steps one through four, while the Commissioner bears the burden in the final step. Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012).

      C.    Review of the ALJ's Judgment

The Commissioner and ALJ's decisions are subject to limited judicial review. The Court may only consider whether the ALJ applied the correct legal standard and whether his or her findings of fact are supported by substantial evidence. When these two conditions are met, the Commissioner's decision is final.  See 42 U.S.C. § 405(g); Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) ("We set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." (citation omitted)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).  If the Commissioner and ALJ's findings as to any fact are supported by substantial evidence, then those findings are conclusive.  42 U.S.C. § 405(g); Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995).

While the Court must consider the record as a whole in making this determination, it is not for this Court to decide de novo whether the plaintiff is disabled.  See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997); Veino, 312 F.3d at 586 ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner.").  The Court must uphold the Commissioner's decision upon a finding of substantial evidence, even when contrary evidence exists.  See Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." (citation omitted)); see also DeChirico, 134 F.3d at 1182-83 (affirming an ALJ decision where substantial evidence supported both sides).

Finally, it is the function of the Commissioner, not the Court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (quoting Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)) (internal quotation mark omitted); see also Gernavage v. Shalala,

882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's [credibility] determination because he heard plaintiff's testimony and observed his demeanor." (citations omitted)).  An ALJ's decision on credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  Soc. Sec. Ruling 96–7p, 61 Fed. Reg. 34484.

      D.    <u>The Treating Physician Rule</u>

"[T]he treating physician rule generally requires deference to the medical opinion of a claimant's treating physician," although an ALJ need not afford controlling weight to a treating physician's opinion that is "not consistent with other substantial evidence in the record, such as the opinions of other medical experts."  <u>Halloran v. Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004) (citations omitted); <u>see also</u> <u>Burgess</u>, 537 F.3d at 128.  An ALJ who does not accord controlling weight to the medical opinion of a treating physician must consider various factors, including "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; [and] (iv) whether the opinion is from a specialist."  <u>Halloran</u>, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)).  After considering these factors, the ALJ must "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." <u>Id.</u> at 33.

Although the ALJ will consider a treating source's opinion as to whether a claimant is disabled or able to work, the final responsibility for deciding those issues is reserved to the Commissioner, and the treating source's opinion on them is not given "any special significance."  20 C.F.R. § 416.927(d)(3); see also Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *3 (July 2, 1996); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).  When a finding is reserved to the Commissioner, "the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.  A treating physician's statement that the claimant is disabled cannot itself be determinative." Snell, 177 F.3d at 133.  It is the ALJ's duty, as the trier of fact, to resolve conflicting medical evidence.  See Richardson, 402 U.S. at 399.

E.    The ALJ's Duty to Develop the Record

Although "[t]he claimant has the general burden of proving that he or she has a disability within the meaning of the Act," "the ALJ generally has an affirmative obligation to develop the administrative record." Burgess, 537 F.3d at 128 (citations and internal quotation marks omitted).  SSA regulations require an ALJ to "inquire fully into the matters at issue and . . . receive in evidence the testimony of witnesses and any documents which are relevant and material to such matters." Id. (quoting 20 C.F.R. § 702.338).  "In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" Id. at 129 (citation omitted); see also Calzada v. Asture, 753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010) ("If the ALJ is not able to fully credit a treating physician's opinion

17

because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such missing information from the physician." (citing Perez, 77 F.3d at 47)).

## III.   DISCUSSION

Plaintiff advances three arguments in support of her position that the ALJ erred in finding that she was not disabled: (1) the ALJ failed to properly weight the medical evidence; (2) the ALJ failed to properly evaluate plaintiff's credibility; and (3) the ALJ erred by relying on the medical-vocational guidelines.  (See Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Mem. in Supp."), ECF No. 17, at 7-6.)

### A.   The ALJ's Decision

The ALJ evaluated plaintiff's claim pursuant to the five-step sequential evaluation process and concluded that plaintiff has not been under a disability within the meaning of the Act since March 28, 2012, the date of plaintiff's application.  At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since March 28, 2012 (the application date).  (Tr. 29.)  At step two, he determined that plaintiff had the following severe impairments: obesity, mood disorder, and anxiety disorder.  Id.  The ALJ determined at step three that none of plaintiff's impairments, nor any combination of those impairments, was of a severity to meet or medically equal one of the listed impairments in Appendix 1 of the regulations.[4]  (Tr. 31-32.)

---

[4] Plaintiff does not challenge the ALJ's determinations at steps 1-3.

At step four, the ALJ determined that plaintiff had the residual functional capacity to perform "light work" as defined in the regulations, except that she is limited to simple and unskilled jobs, particularly those with a Specific Vocational Preparation ("SVP") level of 1 or 2.[5] (Tr. 32-36.)  In making this finding, the ALJ considered plaintiff's symptoms, objective medical evidence and other evidence, as well as opinion evidence.  The ALJ concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [was] not entirely credible." Id.  The ALJ also noted that his finding reflected "limited weight" given to the opinions from treating board psychiatrist Dr. Naco; "little overall weight" given to the opinions from Dr. Tedoff, who conducted a consultative psychiatric assessment of plaintiff at the request of SSA; and "weight" given to the opinions from State agency evaluator Dr. Reddy.  (Tr. 32-36.)  Based on plaintiff's residual functional capacity, the ALJ found that plaintiff was unable to perform any past relevant work.  (Tr. 36.)

At step five, considering plaintiff's "age, education, work experience, and residual functional capacity," the ALJ found "that there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform."  (Tr. 37.)  The ALJ relied on the Medical-Vocational Guidelines (the "Grids") as a framework for his decision and did not utilize a vocational expert.  (Tr. 37-38.)

---

[5] SVP measures "[t]he amount of time required by a typical worker to: learn the techniques, acquire the information, and develop the facility needed for average performance of a job."  20 CFR 656.3. An SVP level of 1 corresponds with "short demonstration only" and an SVP level of 2 corresponds with "anything beyond short demonstration up to and including one month." Id.

B.    Application of the Treating Physician Rule

Plaintiff first claims that the ALJ failed to properly weigh the medical evidence.  (Mem. in Supp. at 7.)  Specifically, plaintiff claims that the ALJ failed to apply the treating physician rule in giving "limited weight" to Dr. Naco.  For the reasons discussed below, the Court agrees.

In primary support of his decision to give Dr. Naco's opinions limited weight, the ALJ noted that he found Dr. Naco's opinions inconsistent with "corresponding treatment notes."  (Tr. 34.)  However, the ALJ did not identify sufficient inconsistencies to support his conclusion.  The main "inconsistency" described by the ALJ was that in a March 2, 2013 report Dr. Naco stated that plaintiff had a GAF score of 48 while treatment notes from the same day indicate that plaintiff had a GAF score of 58.[6]  Id.  This appears to be an obvious typographical error, as plaintiff notes (and defendant does not otherwise argue).  (See Tr. 558, 618.)  In all events, the Second Circuit has emphasized that "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record."  Rosa, 168 F.3d 7at 79.  Thus, before he could rely on the "inconsistent GAF" scores to discount Dr. Naco's opinions in this case, the ALJ was required to develop the record further and determine whether the inconsistency was merely a typographical error.

---

[6] The Court notes that certain facts either discussed by the ALJ or the Commissioner on this motion do not constitute sufficient inconsistencies, such as the fact that plaintiff was able to attend church, was well groomed, maintained eye contact, and had normal speech.

The ALJ also noted that Dr. Naco saw plaintiff relatively infrequently and prescribed only "conservative care." (Tr. 35.)  The Second Circuit has noted that "the opinion of the treating physician [is not] to be discounted merely because he has recommended a conservative treatment regimen," and the "ALJ and the judge may not 'impose[ ] their [respective] notion[s] that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered.'"  Burgess, 537 F.3d at 129 (alterations in original) (quoting Shaw v. Chater, 221 F.3d 126, 134-35 (2d Cir. 2000)).  Here, the ALJ did not point to sufficient evidence beyond what he deemed "conservative care" to discount the opinion of Dr. Naco.

In determining that plaintiff was able to perform simple and unskilled jobs from a mental standpoint, the ALJ gave "weight" to State agency evaluator Dr. Reddy.  (Tr.  35.)  As previously noted, Dr. Reddy did not examine plaintiff but reviewed her record and concluded that plaintiff could follow and understand simple directions and instructions and perform simple tasks independently; that she had adequate skills to perform simple tasks; and that she could relate adequately to others.  (Tr. 494.)  Dr. Reddy noted Dr. Naco's assessment precluding plaintiff from even entry level work, but found it to be inconsistent with the doctor's treatment notes reflecting that plaintiff was cooperative, maintained good eye contact, had normal psychomotor activity, and normal concentration.  (Id.)  Dr. Reddy opined that plaintiff's attention and concentration skills were adequate for the demands of the performance of simple tasks.  (Id.)

The ALJ's reliance in this case on the opinions of Dr. Reddy, a consultative non-examining psychiatrist, was error.  The record and findings by treating physician Dr. Naco contradict those of Dr. Reddy.  As discussed above, Dr. Naco opined that plaintiff was markedly limited – defined as being effectively precluded from performing the activities in a meaningful manner – in her ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerance; work with or near others without being distracted; set realistic foals or make plans independently; and complete a workweek without interruption from psychologically based symptoms.  (Tr. 276-279.)  Dr. Naco found that plaintiff had limited understanding and memory due to poor focus and limited sustained concentration and persistence, social interaction and adaptation due to mood swings, racing thoughts and irritability.  (Tr. 518-19, duplicated at Tr. 609-12, 615.)  Dr. Naco explained that her opinions were based upon her own observations that plaintiff was "quite hyper" and needed redirection and had "trouble focusing" and was "easily irritable, nervous, and impatient" during severe mood swings, causing problems with focus and memory.  (Tr. 497.)  She also stated that plaintiff could be quite sensitive to minor criticisms "and has had issues with staff members."  (Id.)  "While the ALJ had cast doubt upon the findings of [treating physician Dr. Naco], as discussed above, he generally accepted [Dr. Reddy's] findings without explaining why they were more valid.  This suggests that the ALJ selectively relied on evidence that weighed against a finding of a disability.  This is improper—an ALJ may not 'pick and choose evidence which favors a finding that the claimant is not disabled.'"

Rodriguez v. Astrue, No. 07CIV.534 WHPMHD, 2009 WL 637154, at *25 (S.D.N.Y. Mar. 9, 2009) (citation omitted).  The regulations and case law concerning the treating physician rule emphasize that a doctor who personally treats a claimant, and in particular a doctor who has a long-term treating relationship with the claimant like Dr. Naco, is likely to have a better understanding of her condition than a non-examining source.

Defendant correctly notes that the opinions of non-examining sources can be given great weight where they are supported by medical evidence in the record. Here, however, Dr. Reddy's opinion, adopted by the ALJ, is not supported by medical evidence in the record.  See 20 C.F.R. §§ 404.1527(d)(2), 416.927(f); see also Hidalgo v. Bowen, 822 F.2d 294, 297 (2d Cir. 1987) ("A corollary to the treating physician rule is that the opinion of a non-examining doctor by itself cannot constitute the contrary substantial evidence required to override the treating physician's diagnosis.")

Even Dr. Tedoff, who conducted a consultative psychiatric assessment of plaintiff at the request of the SSA, opined that plaintiff had a poor prognosis for maintaining employment.  (Tr. 508.)  The ALJ gave this opinion "little overall weight" because he claimed that Dr. Tedoff "was not privy to the other evidence of record in conducting his examination."  However, the only piece of evidence discussed by the ALJ is a notation by Dr. Naco that plaintiff had been sober for the past six weeks; which the ALJ described as inconsistent with plaintiff's statement to Dr. Tedoff that she had had not used drugs for a year.  (Tr. 35; see Tr. 506.)  The

23

ALJ did not explain how this might impact Dr. Tedoff's conclusion.[7]  Again, before he could discount Dr. Tedoff's conclusions, the ALJ had an obligation to develop the record by, for example, providing Dr. Tedoff with the record evidence he was allegedly not privy to.

In short, the ALJ's failure to apply the correct legal standard in considering Dr. Naco's medical opinion is grounds for reversal.  See Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004).  The Court finds it worth mentioning that "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve."  Burgess, 537 F.3d at 128.  However, the ALJ did not identify such conflicts in reaching his conclusion.

### C.   Assessment of Plaintiff's Credibility

Plaintiff also contends that the ALJ failed to properly evaluate her testimony. (Mem. in Supp. at 12-15.)  The Court agrees.

It is the function of the Commissioner, not the Court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Aponte, 728 F.2d at 591 (quoting Carroll, 705 F.2d at 642 (internal quotation marks omitted)); see also Gernavage, 882 F. Supp. at 1419 n.6.  Although the ALJ is free to accept or reject the testimony of any witness, a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams v. Bowen, 859 F.2d 255, 261 (2d Cir. 1988) (citing Carroll, 705 F.2d at 643).  And if the ALJ finds that the claimant's

---

[7] Nor did the ALJ seek to further develop the record by providing additional evidence (or the record) to Dr. Tedoff for further review.

testimony is not consistent with the medical evidence in the record, he must still weigh the credibility of the claimant's testimony under a non-exhaustive list of factors, which include: (1) plaintiff's daily activities; (2) the location, duration, frequency, and intensity of his pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures, other than treatment, the individual uses or has used to relieve pain or other symptoms; and, (7) any other measures used to relieve pain or other symptoms.  20 C.F.R. § 404.1529(c)(3)(i)-(vii); see also Cichocki v. Astrue, 534 F. App'x 71, 76 (2d Cir. 2013).

The ALJ first described plaintiff's testimony regarding the intensity, persistence, and limiting effects of her alleged symptoms.  (Tr. 32-33.)  The ALJ noted that plaintiff testified to numerous ailments including manic-depressive disorder, bipolar disorder, schizophrenia, diabetes, asthma, and high blood pressure.  (Tr. 32.)  The ALJ further noted that plaintiff testified that she stopped working in 2010 after she was laid off; has learning problems; sees her psychologist twice a month and sees a counselor weekly; continues to smoke cigarettes; and last used cocaine about a year before the hearing.  (Tr. 33.)  The ALJ ultimately concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (Id.)

The ALJ found that while plaintiff "alleges severe mental health issues, the record indicates that her primary psychiatric problem is due to polysubstance abuse." (<u>Id.</u>)  The ALJ noted that "the record shows no drug tests confirming that she is currently sober," and that "the record does not show [plaintiff] has been active in drug treatment."  The ALJ thus found that "considering the evidence as a whole, [he] is unable to rule out the potential effects of substance use as a catalyst or cause of [plaintiff's] alleged symptoms, e.g., troubles with focus, memory and mood."  (<u>Id.</u>)

The ALJ's boilerplate assertion that plaintiff's testimony was "not entirely credible" is insufficient.  The ALJ provided no support for his assertion that "the record indicates that [plaintiff's] primary psychiatric problem is due to polysubstance abuse."  To the contrary, Dr. Naco reported that plaintiff's use of drugs and/or alcohol was a symptom of her condition or form of self-medication, and that plaintiff's disability was independent of any substance use. (Tr. 626.)  The ALJ cannot substitute his own views for actual medical evidence in the record.  <u>See</u> <u>Balsamo</u>, 142 F.3d at 81 (2d Cir. 1998).  Here, plaintiff's subjective testimony was consistent with the objective medical facts and medical opinions in the record.

Furthermore, the ALJ failed to give a single reason for finding plaintiff's statements related to her physical limitations not credible.[8]

D.   <u>Plaintiff's Ability to Perform Substantial Gainful Activity</u>

Lastly, plaintiff argues that the ALJ erred at step five of the sequential analysis by relying on the medical-vocational guidelines.  (Mem. in Supp. at 15.)

---

[8] Defendant does not appear to contest this point.

Once the ALJ determined that plaintiff could not complete her past relevant work, he was required, under step five, to determine whether there was work in the national economy that plaintiff can do.  Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Bapp v. Bowen, 801 F .2d 601, 604 (2d Cir. 1986)).  The Court agrees that the ALJ failed to adequately sustain his burden at step five.

"If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert."  Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp, 802 F.2d at 605.  Importantly, the "mere existence of a nonexertional impairment does not automatically . . . preclude reliance on the guidelines." (Id.) (ellipsis in original).  "A nonexertional impairment 'significantly limit[s]' a claimant's range of work when it causes an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'"  (Id.) (quoting Bapp, 802 F.2d at 605-06 (2d Cir. 1986)).

Here, the ALJ acknowledged that plaintiff had "moderate limitations of her ability to maintain concentration, persistent and pace" and that plaintiff's mental impairments were "severe" yet found that "there is no evidence that [plaintiff's] impairments so drastically limit these abilities as to preclude gainful employment at the light exertional level."  (Tr. 37.)  For the reasons described above, this finding is not supported by substantial evidence.  The record clearly demonstrates – including treatment notes and the opinions of Dr. Naco and Dr. Tedoff – that

plaintiff's impairments significant limit her capacity to work.  If the ALJ did not wish to call a vocational expert, he was required to "submit other evidence of jobs that an individual with [plaintiff's] limitations could perform, or to explain fully why plaintiff's limitations are not significant enough to warrant the opinion of such expert."  Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 442 (S.D.N.Y. 2010).  The ALJ erred by failing to take any of these measures.

     E.    Remedy

     The Social Security Act directs that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405.  The Second Circuit has explained that "where the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate."  Quinion v. Apfel, 8 F. App'x 53, 54 (2d Cir. 2001); see Rosa, 168 F.3d at 82-83.  That is, when "further findings would so plainly help to assure the proper disposition of [the] claim, we believe that remand is particularly appropriate."  Id. (alteration in original).  On the other hand, "where this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits."  Michaels v. Colvin, 621 F. App'x 35, 38 (2d Cir. 2015) (quoting Rosa, 168 F.3d at 83).

     The Court has noted several gaps in the administrative record that were not properly developed by the ALJ, including, inter alia, the alleged "inconsistency" in plaintiff's GAF score reported by Dr. Naco.  The Court thus remands this case to the

28

ALJ for further proceedings consistent with this Opinion & Order.  Upon remand, the ALJ must appropriately apply the legal principles as described above.

IV.    CONCLUSION

For the aforementioned reasons, plaintiff's motion is GRANTED, and defendant's motion is DENIED.  This case is remanded for further proceedings consistent with this Opinion & Order.  The Clerk of Court is directed to terminate the motions at ECF Nos. 16 and 22 and to terminate this action.

SO ORDERED.

Dated:      New York, New York
            April 3, 2017

_____
      KATHERINE B. FORREST
      United States District Judge